AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Virginia

CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

7/14/20
JULIA C. DUDLEY, CLERK
BY: s/ ELLA SURBER
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Information associated with Facebook user name SAMMY.MCMAHAN.9 that is stored at premises controlled by Facebook | ) ) ) ) |

Case No.  1:20MJ97

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 | Drug Conspiracy |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ryan Temm, Senior Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/14/20

*Judge's signature*

City and state:  Abingdon, VA

Pamela Meade Sargent, USMJ
*Printed name and title*

Respectfully submitted,

Senior Special Agent Ryan C. Temm
Bureau of Alcohol, Tobacco, Firearms, and
Explosives
United States Department of Justice

Subscribed and sworn to before me on _____July 14_____, 2020

HONORABLE JUDGE PAMELA MEADE SARGENT
UNITED STATES MAGISTRATE JUDGE IN THE
WESTERN DISTRICT OF VIRGINIA

Reviewed by:  Lena Busscher, AUSA

## ATTACHMENT A

### Property to be searched

This warrant applies to information associated with Facebook user Sammy McMahan (user name sammy.mcmahan.9), with Facebook ID 100023341930926 (Facebook case number 5042670) that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.   **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them to include "Facebook Live" videos;

(d)   All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)    All "check-ins" and other location information;

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)    All information about the Facebook pages that the account is or was a "fan" of;

(j)    All past and present lists of friends created by the account;

(k)    All records of Facebook searches performed by the account;

(l)    All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

II.     **Information to be seized by the government**

Upon receipt of the information from Facebook described in Section I of Attachment B, government authorized persons will review that information to locate the items described below. All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21 U.S.C. § 841(a) and 846 involving Sammy MCMAHAN including, for each user name identified on Attachment A, information pertaining to the following matters:

(a) Communications (e.g. posts and messages (public and private), friend requests etc.) between Sammy MCMAHAN and any other potential suspects/witnesses.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR A SEARCH WARRANT**

I, Ryan C. Temm, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18 United States Code.

3. I am a Senior Special Agent (SSA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been employed for approximately twelve (12) years. I received my training with the Federal Law Enforcement Training Center (FLETC), and the ATF at the National Academy in Brunswick, Georgia. At the ATF National Academy we trained in various investigative techniques to include preparing a proper search warrant. Since becoming a Special Agent with ATF, I have participated on numerous search and arrest warrants. I have a Bachelor of Arts Degree in Criminal Justice from The George Washington University and a Master of Public Administration from the University of North Carolina at Charlotte. I also successfully completed a basic law enforcement academy with the Charlotte-Mecklenburg Police Department and served nearly eight years as a police officer.

4. Based on my training and experience I have become familiar with methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds. The affiant is aware of the sophisticated tactics they routinely use to attempt to thwart detection by law enforcement which include the utilization of numerous

different cellular telephones, counter surveillance, elaborately planned distribution
schemes, false or fictitious identities and coded communications and conversations.

5.  The facts in this affidavit come from my personal observations, my training and
experience, and information obtained from other agents and witnesses. This affidavit is
intended to show merely that there is sufficient probable cause for the requested warrant
and does not set forth all of my knowledge about this matter.

6.  Based on my training and experience and the facts as set forth in this affidavit, there is
probable cause to believe that violations of 21 USC 846, Conspiracy to Possess with
Intent to Distribute Methamphetamine, have been committed by Sammy MCMAHAN
and others. There is also probable cause to search the information described in
Attachment A for evidence of these crimes and contraband or fruits of these crimes, as
described in Attachment B.

## PROBABLE CAUSE

7.  One of MCMAHAN's indicted co-conspirators was Travis PENNINGTON.  On
February 14, 2019, I obtained a federal Search Warrant in the Western District of
Virginia for data associated with the Facebook account of Travis PENNINGTON.  On
Tuesday, March 5, 2019, I received the results of the Search Warrant. Listed below is
text of some of the Facebook Messenger conversations between PENNINGTON and
MCMAHAN's accounts:

12/25/2017 at 0200hrs from Travis PENNINGTON:     "You got a q?"
12/25/2017 at 0655hrs from Sammy MCMAHAN:         "No"

*In my opinion, the letter "q" refers to a quarter and in many cases it further refers to a
quarter ounce of methamphetamine.  It could, however, refer to a quarter of any of the more
common weights associated with the sale of methamphetamine including gram, ounce,
kilogram or pound.*

12/30/2017 at 2149hrs from Travis PENNINGTON:     "Hey bubb"
12/30/2017 at 2247hrs from Sammy MCMAHAN:         "Working on something"
12/30/2017 at 2249hrs from Travis PENNINGTON:     "OK bud appreciate it…your
                                                   buddy said in the morning"
12/31/2017 at 0239hrs from Sammy MCMAHAN:         "Man I tried"
12/31/2017 at 0252hrs from Travis PENNINGTON:     "He took care of me bud"

*In my opinion, "working on something" in this context most likely means that MCMAHAN is
working on a deal to buy methamphetamine and that his bud would be ready in the morning.*

1/16/2018 at 0412hrs from Sammy MCMAHAN:          "Lacy here pulling the i got robbied
                                                   with your money"

| 1/16/2018 at 0501hrs from Travis PENNINGTON: | "That's y I didn't go when she ask me" |

*In my opinion, "Lacy here pulling the i got robbied with your money" means that, as is/was a common occurrence, people pool their money with one person who goes to pick up the methamphetamine/drugs. The more drugs that can be purchased the cheaper it usually is. Further many people will say they were robbed, money was taken and no drugs were provided so they can keep all the drugs they bought or in other cases they actually paid money for the drugs and were given fake drugs or none at all.*

| 1/26/2018 at 0842hrs from Travis PENNINGTON: | "I'm leaving now do you wanna ride" |
| 1/26/2018 at 0842hrs from Travis PENNINGTON: | "?" |
| 1/26/2018 at 0843hrs from Sammy MCMAHAN: | "Go halves on one" |
| 1/26/2018 at 1729hrs from Sammy MCMAHAN: | "They still want that puff puff" |
| 1/27/2018 at 2149hrs from Sammy MCMAHAN: | "Cancel that pp" |
| 1/27/2018 at 2151hrs from Travis PENNINGTON: | "Oh shit I forgot about that" |
| 1/27/2018 at 2153hrs from Sammy MCMAHAN: | "They finally got hooked up" |

*In my opinion, in this context, "I'm leaving now do you wanna ride?" means PENNINGTON is going to purchase methamphetamine/drugs and wants to know if MCMAHAN wants to go and go halves (50%) on "one" or one ounce. "Puff Puff", in my opinion is a reference to marijuana and "they finally got hooked up" means they were able to purchase the "puff puff."*

| 2/5/2018 at 1119hrs from Travis PENNINGTON: | "Can you do anything I can't find shit" |
| 2/5/2018 at 1504hrs from Sammy MCMAHAN: | "Maybe but im tied up now" |
| 2/5/2018 at 1504hrs from Travis PENNINGTON: | "I'm good now" |

*In my opinion, "can you do anything I can't find shit" means PENNINGTON is asking MCMAHAN if he can supply him with methamphetamine/drugs because PENNINGTON can't currently locate any. When PENNINGTON says "I'm good now" means he found some.*

On November 6, 2019 PENNINGTON pled guilty to numerous federal charges, including Drug Conspiracy.

8. On January 18, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Scott County Sheriff's Office (SCSO) Investigator Clint Johnson interviewed Cody Clifton. Clifton said Sammy MCMAHAN (8/30/1966, 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) is selling triple the amount of meth PENNINGTON was. Clifton said some of MCMAHAN's customers include: Crystal Owens, Shannon Owens, Sam Caudill, Lindsey Massey, Jenny Summey, Kelsey Vernon, Morgan McMahan and as Clifton said, everyone in Big Stone Gap. Clifton said MCMAHAN carries a gun. He said MCMAHAN fronted him an ounce to an ounce and a half of meth three times a week over the period of two to three years up until about five or six months ago.

9. On February 1, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Scott County Sheriff's Office (SCSO) Investigator

Clint Johnson interviewed Shawn BARNES at the Southwest Virginia Regional Jail at Duffield.  BARNES stated he knows that in addition to himself PENNINGTON sold meth to Lewis HICKMAN, Larry DEATON, Sam CAUDILL and Jeremy MALLORY. He said PENNINGTON was also buying from and selling to Sammy MCMAHAN.

10. On February 26, 2019, DEA TFO Brandon Johnson and ATF SA Ryan Temm interviewed Harvey NAPIER at the Duffield Regional Jail in Southwest Virginia. NAPIER said Josh DAVIS supplied methamphetamine to subjects in Virginia. They included:  Eddie REGAN, Sammy MCMAHAN, Tony MCCLELLAN and Travis PENNINGTON.  NAPIER had heard others bragging that a Virginia officer possibly named Scott was warning MCMAHAN that law enforcement was coming. NAPIER could not provide an agency or any other information.

11. On March 1, 2019, TFO Brandon Johnson, ATF SA Ryan Temm, and Scott County, VA, Detective Clint Johnson met with Mark Adam BURKE at the Scott County, Virginia, Courthouse. BURKE said he got out of jail on March 12, 2018 and sold meth to various people until his arrest on June 16,2018. Sammy MCMAHAN was also buying meth from Sharon BACON, BURKE, said. He said "Bird" usually came with him, he drove a Chrysler 300.  BURKE said MCMAHAN bought from BACON for about a year, once a week, an ounce to two ounces for $700-800.

12. On March 5, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest (Virginia) Drug Task Force Agents Larry Mullins and Kenneth Hill interviewed Krystal Hayes at the Wise County Sheriff's Office. Hayes said she has been with Josh "Bacon" SUTHERLAND for about four years, married since April 2015.  Hayes named the following people SUTHERLAND has bought meth from:  Jeremy MALLORY, Amber Smith, Sharon Bacon, Louisville Bob, Adam BURKE, Tony MCCLELLAN, Sammy MCMAHAN, Clint Flannery, Denny Mullins, Joe HOBBS, Curly (EISENMENGER), Larry Napier, Chewie (Matt Howard), Ashley Beverly's girlfriend, Sherry LNU and Paul (drives blue HHR with NC tags).

13. On March 21, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm, Drug Enforcement Administration (DEA) Task Force Officer (TFO) Brandon Johnson and Southwest Drug Task Force Agent Clint Johnson interviewed Honey Lytle at the Scott County Sheriff's Office. Lytle stated she was on pain pills, and then started using meth about 5 years ago. Julie Minor introduced her to meth and she got it from Sammy MCMAHAN.  That was when he lived in the trailer on

Seminary Road in Dryden. Lytle said she would ride with MCMAHAN to get meth from Curly (Steven EISENMENGER). She said in the beginning (five years ago) there was a circle of friends to include: Sammy MCMAHAN, Travis PENNINGTON, Joe HOBBS, Lewis HICKMAN, Jamie CHRISTIAN, James "Stix" JOHNSON, Aaron Adams, Sean Clifton, Rob Renfro, Joseph "Cracker" FLANNERY, Tony MCCLELLAN, Susan MULLINS and James Head who would put money to buy meth from EISENMENGER and then Sharon BACON. HICKMAN, HOBBS, PENNINGTON and JOHNSON all hung out together. Additionally, Lytle said the following people sold meth they got from PENNINGTON or sold for him:

- Kalen Rollins - was arrested in Dryden with Sierra Hyde, "Georgia," and Aaron Lovell with 37 grams;
- Larry DEATON - he didn't sell much, he was not very good with his money;
- Jon FUNK - PENNINGTON cut him off over a disagreement;
- Sammy MCMAHAN – for 6 months to year, buying two ounces daily. He wants people to bring him dope (no license). Used to go to BACON and EISENMENGER also;
- Lewis HICKMAN – in the end he got his own source and was trying to undercut PENNINGTON, was getting a pound every couple days from a "Cartel" source;
- Joe HOBBS - would get ½ ounce from PENNINGTON daily before he found new source; he would get up everyone's money and buy from a source in Georgia, Knoxville or Kingsport. She said people began splitting from PENNINGTON because he was an "asshole";
- Misty NELMS – PENNINGTON's girlfriend, she is a nurse and was just a user until she got together with PENNINGTON and came into some money and then she started to move weight;
- Jamie CHRISTIAN - was getting for PENNINGTON before he went to jail. He went Georgia, Sharon LNU in Johnson City and David Kaywood;
- James JOHNSON – he would take up money from others and buy ¼ to ½ ounces weekly;
- Sam CAUDILL;
- Travis SKAGGS.

Lytle said she sold meth to the following people: Sammy MCMAHAN, Toby Plaster, Jeremy Muse, Jimmy SHUPE, Aaron Lovell, Brandon Bates, Farrin Clark, Shawn Bowman, Shawn BARNES (sold a lot to her also, traded him meth for his mom's pill or marijuana). Lytle said the following people carry guns for protection and/or will trade them for meth: Sammy MCMAHAN, Travis PENNINGTON, Lewis HICKMAN, Joe HOBBS, Jamie CHRISTIAN and James JOHNSON. Lytle said everybody including herself was using Facebook Messenger to communicate for drug dealing due to people stealing each other's SIM cards. She said, basically, her whole drug buying/selling life is on Messenger.

14. On March 22, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest Drug Task Force Agents J.T. Coleman and Clint Johnson interviewed Brandon Cox at the Southwest Virginia Regional Jail, Duffield. Cox said when Sammy MCMAHAN lived in the trailer in Lee County he (Cox) traded him (MCMAHAN) a pistol for an 8-ball. Additionally, from January to March 2018 Cox said he bought at least a half ounce from MCMAHAN daily. Cox said MCMAHAN's daughter, Morgan, was present at the trailer a lot when the drug dealing was taking place. Cox said he knows MCMAHAN also sold meth to Tyler Chandler.

15. On March 28, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest (Virginia) Drug Task Force Agent Kenneth Hill interviewed Travis Kilgore at the Southwest Drug Task Force office. During February he met Joanna Baber and she offered to take him to Kingsport to get cheaper meth, he never went with her, he said. She introduced him to Sammy MCMAHAN, Josh SUTHERLAND and Cindy Clark. He said he never bought meth from MCMAHAN and only one or two times from Clark.

16. On April 4, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest Drug Task Force Agent Clint Johnson interviewed Chayne Parsons at the Scott County Sheriff's Office. Parsons said he has sold meth to: Susan MULLINS (has tried to get ½ ounces from him at a time), JT Green, Rikki Capps, Brandon Dye, Shawn BARNES, Sammy MCMAHAN, Sam CAUDILL (has been calling him the last three weeks to get) and a couple others. Parsons said he usually tries to sell only 8-balls at a time.

17. On April 5, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest Drug Task Force Agent Clint Johnson interviewed Rebekah Light at the Scott County Sheriff's Office. Light said Parsons has dealt with Sammy MCMAHAN. When he (MCMAHAN) lived at Shawn Bowman's

house it was wide open (due to how much meth MCMAHAN was bringing in).

18. On April 5, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest Drug Task Force Agent Clint Johnson interviewed Nicholas Harber at the Scott County Sheriff's Office. Harber said he is from Lee County, but used to live in Wise County and Kingsport. He had been living in Wise around June/July 2017 when he went to live in Kingsport with "Curly" (Steven EISENMENGER) for about ten months. Harber said the people he sold meth to were all people he had known for a while. This included Sammy MCMAHAN – would come over to Kingsport with Honey Lytle and Ray "Bird" Branham Jr. to purchase meth from EISENMENGER or him. Harber called Lytle a selling machine, he said he saw her sell 20 ounces in 30 minutes. They would usually buy 2 pounds or more twice a month for $8,000-9,000;

19. On April 11, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest (Virginia) Drug Task Force Agent Bucky Culbertson interviewed Allison Bates at the Southwest Drug Task Force office. Bates stated she has taken Robbie Amos and Michael Turner to Sammy MCMAHAN's. She said she knew MCMAHAN's daughter, Morgan, before Sammy. She said she dealt with Morgan more on user amounts, ½ gram to a gram until Morgan went to jail. She said Sammy wouldn't deal with her before Morgan went to jail because she was Morgan's customer. After Morgan went to jail she bought from him three times, 8-ball, 8-ball and ¼ ounce. MCMAHAN's source was in Kingsport.

20. On April 24, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest (Virginia) Drug Task Force Agent J.T. Coleman interviewed Steven EISENMENGER at the Sullivan County Jail. EISENMENGER's attorney, Leslie Tiller, was also present. EISENMENGER said Sammy MCMAHAN bought ounces from him, but didn't want to talk about him, he was a "good guy."

21. On May 7, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm, Southwest Drug Task Force Agent Clint Johnson and Drug Enforcement Administration (DEA) Task Force Officer Brandon Johnson interviewed Misty Harris at the Scott County Sheriff's Office. Harris said when CHRISTIAN was out of meth he often went to Sammy MCMAHAN's to get it. She said CHRISTIAN was selling to John Rollins, Jerry Rollins, Gabe Bentley, Kelsey Vernon and Morgan McMahan. Harris said her knowledge comes from the fact CHRISTIAN stayed at her

house in East Stone Gap on and off (half the time) for about three months. She said CHRISTIAN gave her a gram a day for this courtesy. Harris said she has bought two to three 8-balls from Sammy MCMAHAN in 2017, but he has recently contacted her on Facebook Messenger. He wanted her to take him to Keokee to pick up meth. Harris said once in 2019 she took Morgan McMahan to Adam BURKE's to get meth. Harris said last week Cody Clifton was trying to get her to take him and Morgan McMahan to a source in Keokee, but she didn't know who it was.

22. On May 8, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest Drug Task Force Agent Clint Johnson interviewed Jessica Honeycutt at the Southwest Virginia Regional Jail at Duffield. Honeycutt said she has been to Sammy MCMAHAN's house to buy meth before with Lonnie and Teresa and Jay Head. She said Teresa went in to buy it.

23. On May 10, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest (Virginia) Drug Task Force Agent Larry Mullins interviewed Shana Hall. Hall said in the fall of 2018 her sources were in Tennessee. She said Marie LNU would take her to various places to buy meth including from: Curly (EISENMENGER), Marie's sister and a trailer near the First Bank and Trust in Bristol. Hall said Marie's sister is friends with Sammy MCMAHAN and she said MCMAHAN had also bought meth from this woman. In the fall of 2018 Hall said she bought 3.5 ounces for $1,800 from Curly. Hall said she had given the money to Marie, but she was present for the transaction. Hall said John Cantrell sold her a couple guns one time. On another occasion in the summer or 2018 her neighbors, Sasha and Brian, left a 12ga. shotgun at her house. She took it to MCMAHAN's house in Lee County and traded it to him for meth. She said he was supposed to have given her about $150 worth, but he didn't give her quite that much. Hall said she was introduced to MCMAHAN by Amy Craft. She bought meth from him every other day for a couple months late in 2018. She said she bought from a ¼ and ½ ounce to a full ounce. She said he usually had the quarters and halves, but would have to take her money and go get the ounces. He would usually have it for her the next day. Half her transactions were for quarters/halves and the other half were ounces. Hall said the last time she dealt with MCMAHAN he ripped her off for $700. She believes they thought she was a "narc." Hall stated she communicated via Facebook Messenger for most of her drug transactions

24. On May 20, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest (Virginia) Drug Task Force Agent Bucky

Culbertson interviewed Carmen Long at the Federal Courthouse in Big Stone Gap. Long said she has done more meth with Kenny Bishop than anyone else and he introduced her to Sammy MCMAHAN. Long said she had been staying at Sammy MCMAHAN's house on Seminary on and off during the last two years. She said she helped him around the house and looked after his grandson, Kaden, and in turn he gave her crystal methamphetamine (meth). She said he gave her .2 grams every day she was there, which totaled, in her estimation, about 3 months' worth of days. MCMAHAN sold meth to: Honey Lytle, Cody Clifton, Cindy Clark, Lindsey Massey and Crystal Bishop among others. Massey also stayed at MCMAHAN's and Long said she saw her with a sawed-off shotgun. She said she has never seen MCMAHAN with guns and he tried to stay away from them. Long said she met David "Spike" RINGLEY a little over a year ago when he came to MCMAHAN's to deliver meth. Long said RINGLEY often had a pound of meth on him and would deliver to MCMAHAN's five to six time a day when MCMAHAN was living at Shawn Bowman's. The delivery weight ranged from a ¼ ounce to a pound every time. She said she hung out with RINGLEY from about December 2018 until their arrest on February 7, 2019. She thinks MCMAHAN wanted to get her together with RINGLEY to better his sources, but she was confused when RINGLEY picked her up and had his girlfriend, Dezray Collins, with him. Long said RINGLEY sells to: Jamie Jessee, Brandy HAMILTON, Bridgette Bledsoe, Sammy MCMAHAN, Bebe LNU, Shawn Bowman and Shane Holbrook among others.

25. On May 20, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Ryan Temm and Southwest Drug Task Force Agent Bucky Culbertson interviewed Michael Minnix at the Southwest Virginia Regional Jail at Duffield. Minnix said he bought and used methamphetamine (meth) in 2017 before he went to prison and got back into it when he got out of prison on December 24, 2018. Minnix stated in 2017 he bought meth from Joe Freeman (his step-father), Travis Kilgore, James Laforce (his uncle), Sammy MCMAHAN, Tony MCCLELLAN, Jeff Martin, Matthew Addington, Petey Bowen, Crystal Farmer, Josh SUTHERLAND, Kevin Mullins and Robin Phipps among others. Minnix said his girlfriend is Heather Stanley. Stanley called Josh "Bacon" SUTHERLAND to get meth some time right after he got out of prison. He said SUTHERLAND came straight over to the apartment. Minnix said he (SUTHERLAND) is a big guy was wearing overalls and had a silver derringer with brown handle hanging from a chain around his neck. Minnix said SUTHERLAND had 6-7 ounces in a fanny pack of which they bought an 8-ball. After this Minnix said he

ran dope and guns for SUTHERLAND for approximately three to three and a half months. He said he delivered 3-4 8-balls at a time, usually up to 15 people a day. The amounts different people got varied. He said SUTHERLAND just used a scoop to take it from a bag to put it in another bag for Minnix, which he (SUTHERLAND) never weighed. Minnix said he always weighed it out before delivering. He thought SUTHERLAND may have been testing him. After adding and multiplying the above numbers Minnix thought 5 pounds was a bit low for how much he would have delivered for SUTHERLAND over the period. For SUTHERLAND, Minnix said he sold to: Sammy MCMAHAN, Crystal Farmer, Shycote Fritz, James Laforce, Sherry Fillmore, Mikey Jones, Rhonda Kilgore, Rhonda Hicks, Beau Kilgore, JR Laforce, Tony MCCLELLAN, Travis Kilgore, Shane Childs and Brian Mullins among others. Minnix stated on one occasion he took six "hot" handguns to Sammy MCMAHAN at the direction of SUTHERLAND. Minnix said he was told they were stolen and had been brought over from Kentucky. Minnix said MCMAHAN gave him $1,000 and an 8-ball or 8-ball and a half of meth for the guns. When he returned to SUTHERLAND, SUTHERLAND gave him $600 and the meth. Heather Stanley was with him, he said. Minnix said he was at MCMAHAN's one time when Tony MCCLELLAN brought a pound of meth there. MCMAHAN sold to: Travis Kilgore, James Laforce, Crystal Farmer, Derrick Gibson and Eugene and Ben Salyers among others.

26. On June 29, 2020, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Senior Special Agent (SSA) Ryan Temm and Drug Enforcement Administration (DEA) Task Force Officer (TFO) Brandon Johnson conducted a proffer interview of Steven EISENMENGER at the Carter County (TN) Jail. His attorney, Jonathan Wood, was present. EISENMENGER said he met Sammy MCMAHAN through his (EISENMENGER's) girlfriend, Amber Burns in 2017. EISENMENGER said MCMAHAN bought meth from him over the course of approximately a year. EISENMENGER stated most of the deals were done through Sharon BACON at her residence in Kingsport. On average, EISENMENGER said MCMAHAN was buying about an ounce a week from him. EISENMENGER said MCMAHAN bought meth from Connie TERRY also. He knows this because he referred MCMAHAN to TERRY. EISENMENGER said on the occasions when MCMAHAN came to buy meth from him in Kingsport he was driven by others, usually a female. These females, included among others, Allison Raines (Bates) and Honey Lytle. He also described a male in his 60s, shoulder length blond hair, driving a Geo Tracker, as someone who drove MCMAHAN

to pick up meth. EISENMENGER stated he never traded guns with MCMAHAN.

27. A check of MCMAHAN's Facebook profile on July 10, 2020 showed his last public posting was on July 14, 2019. MCMAHAN was arrested on July 14, 2019 after having been indicted by a Federal Grand Jury sitting in the Western District of Virginia for Conspiracy to Distribute Methamphetamine and Using or Carrying a Firearm in Relation to a Drug Trafficking Crime.

28. Through participation in this investigation, I have knowledge MCMAHAN maintained a Facebook account to communicate with other Facebook users about the distribution of methamphetamine. A review of Facebook public records indicate Facebook user Sammy MCMAHAN maintains a Facebook account with a user identification number of 100023341930926.

29. On July 10, 2020, a preservation request was sent to Facebook Inc. to preserve data associated with the account.

30. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

31. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites and other personal identifiers. Facebook also assigns a user identification number to each account.

32. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events and birthdays.

33. Facebook users can select different levels of privacy for the communications and

information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

34. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments and links that will typically be visible to anyone who can view the user's profile.

35. Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

36. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

37. If a Facebook user does not want to interact with another user on Facebook, the first user

can "block" the second user from seeing his or her account.

38. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

39. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

40. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

41. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, Live Journal, and Blogger.

42. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

43. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

44. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

45. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts;

pokes; tags; and information about the user's access and use of Facebook applications.

46. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and

chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

50. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

51. Based on the forgoing, I request that the Court issue the proposed search warrant.

52. This Court, the United States District Court for the Western District of Virginia, has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).

53. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.